# STATE FARM INSURANCE
# CLAIM NO.: 06-28Z0-27L

# SMOKE DAMAGE ASSESSMENT

## GEOFFREY HART
## 122 VISTA LANE
## LOUISVILLE, COLORADO

## JULY 2022

PREPARED BY:

JS | HELD

**1999 HARRISON STREET, SUITE 1440**
**OAKLAND, CALIFORNIA 94612**
**(510) 740-0387**

J.S. HELD PROJECT NO.: 22070591

## TABLE OF CONTENTS


SECTION PAGE

1.0 INTRODUCTION ....... 1

2.0 BACKGROUND ....... 1

3.0 OBSERVATIONS ....... 1

4.0 COMBUSTION BYPRODUCT SAMPLING ....... 2

4.1 Combustion Byproduct Information ....... 2

4.3 Combustion Byproduct Sample Collection ....... 3

4.4 Combustion Byproduct Sample Results ....... 5

5.0 DOCUMENT REVIEW ....... 6

5.1 Review Summary ....... 6

5.2 Document Review Conclusions and Recommendations ....... 12

6.0 LIMITATIONS ....... 13

7.0 CONCLUSIONS AND RECOMMENDATIONS ....... 13

8.0 SMOKE DAMAGE RESTORATION PROTOCOL ....... 14

8.1 General Asbestos and Lead Information ....... 14

8.2 Industry Standards and Guidelines ....... 15

8.3 General Process ....... 15

8.4 Scope of Work ....... 16

8.5 Combustion Byproduct Cleaning Protocol ....... 17

8.6 Decontamination Area (General Information) ....... 18

8.7 Work Area Preparation ....... 18

8.8 Post-Restoration Verification Criteria ....... 18

**APPENDICES**

A Photographs

B Laboratory Analytical Report and Chain of Custody

C Sample Location Diagrams

## 1.0 INTRODUCTION

J.S. Held LLC (J.S. Held) was retained by State Farm Insurance (Claim No.: 06-28Z0-27L) to perform a smoke damage assessment of the Geoffrey Hart residence located at 122 Vista Lane in Louisville, Colorado (herein referred to as the subject property). The assessment included visual inspection of the subject property and collection of surface tape lift samples for combustion byproducts to evaluate damages as a result of the Marshall Fire (wildfire), establish patterns of smoke impact, and provide a restoration protocol, as necessary. J.S. Held also performed a document review of a Smoke Testing Report prepared by CIAQP. The assessment was performed on July 13, 2022, by Mr. Jason Mosman, an American Council for Accredited Certification (ACAC) Certified Fire and Smoke Damage Consultant (CFSC).

J.S. Held collected photographs of conditions of the subject property, and representative photos are included in **Appendix A**. Laboratory reports and sample location diagrams for combustion byproducts are included in **Appendices B** and **C,** respectively.

## 2.0 BACKGROUND

The Marshall Fire originated in the vicinity of Highway 93 and Marshall Road in the city of Boulder, Colorado. The subject property is located at the eastern boundary of the Marshall Fire, approximately four (4) miles east-northeast of the reported fire origin location. The fire began on December 29, 2021 and covered over 6,000 acres before being fully contained on January 3, 2022.

The nearby single-family homes, less than 300 feet away were directly impacted by the wildfire and completely burned down.

## 3.0 OBSERVATIONS

The subject property is a 2,214 square foot, two-story (not including the basement), single-family residence which consists of the following: main level garage, living room, dining room, kitchen family room, laundry room, hallway and bathroom, as well as an exterior patio; upper-level master bedroom, master bathroom and walk-in closet, hallway, hallway bathroom, office, and two bedrooms with closets. There is also a built-out basement level that consists of a living room area, bar, bathroom, storage/mechanical closet, and a bedroom area. The residence is a slab-on-grade, wood-framed structure with a vented attic. Exterior finishes generally consist of a mixture of stone and vinyl siding with concrete and wood trim as well as composite roof tiles/shingles. Interior finishes generally consist of painted and textured drywall walls and ceilings with wood trim and cabinets. Interior floor finishes consist of a mixture of laminate, and tile flooring. The residence has split Heating, Ventilation and Air Conditioning (HVAC) systems consisting of an air condenser located on the exterior and air handling unit with flexible ductwork located inside the residence.

J.S. Held did not detect smoke related odors in the subject property. Visible wildfire smoke particulate deposition was not observed on exterior surfaces inspected. Visible wildfire smoke particulate deposition was observed on interior floor surfaces at entry points and in the vicinity of HVAC floor supply vents. Visible wildfire smoke particulate deposition was also observed on other horizontal surfaces at points of entry, including on baseboards, shelves, counters, and contents in the vicinity of windows and exterior doors. Visible wildfire smoke particulate was also observed on horizontal surfaces and on boxes of contents within the garage and on insulation and horizontal surfaces within the attic. No visible or physical signs of smoke pressurization impacting the wall or ceiling cavities were observed at the subject property at the time of the inspection. Wipe testing of vertical and ceiling surfaces did not identify the presence of residue on exposed vertical and ceiling surfaces at the subject property.

## 4.0 COMBUSTION BYPRODUCT SAMPLING

As it was reported that the Marshall Fire (wildfire) occurred in the vicinity of the subject property, a sampling and analysis strategy was developed to determine potential impact throughout the exterior and interior of the subject property. Sampling was conducted for combustion byproducts (soot, char and ash) to determine impact from wildfire related compounds.

### 4.1 Combustion Byproduct Information

Combustion byproducts are defined by the analytical laboratory to be those materials that are consistent in morphology (i.e., structure) with soot, char, and/or ash.

**Soot**
Black Carbon (soot) is defined as a randomly formed particulate of carbon, commonly with a spherical to pseudo-spherical (aciniform) morphology. It is a byproduct of uncontrolled combustion.

**Char**
Char is defined as the layer of black particulate resulting from the burning of organic material which retains the morphology of the original substance.

**Ash**
Ash is defined as the white outermost layer resulting from the burning of organic material with only slight remains of the original morphology detectable.

### 4.2 Combustion Byproduct Evaluation Criteria

As there are no regulations regarding the concentration of soot, char or ash impact levels on surfaces, J.S. Held utilizes multiple criteria in the review of the data to evaluate the samples for impact, including the following: laboratory provided criteria, identification of and concentration of particulates on the sample, review of concentrations of each component against each other, source location of the fire and combustion byproducts,

other potential sources of combustion byproducts (background), visual observations and location of samples that were collected, as well as potential for continued impact from identified sources.

The following criteria provided by the laboratory, Environmental Analysis Associates, Inc. (EAA), is utilized as a preliminary screening tool, which assists in the determination and presence and extent of surface impact based on soot, char or ash concentrations.

| Ratio (%) and Surface Concentration | | |
|---|---|---|
| **Classification (Impact)** | **Total Fire Residue (Ratio %)** | **Total Fire Residue ($ct/mm^2$)** |
| **Typical – Low** | <1% | <1 |
| **Typical – Upper Background** | 1 – 3% | 1 – 5 |
| **Atypical** | 3 – 10% | 5 – 50 |
| **Elevated** | >10% | >50 |

The impact of dust loading is important in the evaluation of samples. For the interpretation of the results, the total ratio percent results column is utilized when there is heavy dust loading and/or long-term settled dust. If dust loading is not considered, the percent ratio of the result between the fire residue and the dust loading would be skewed in the total ratio percent column. With samples with light loading, the counts per millimeter square ($ct/mm^2$) are to be used.

In addition to the dust loading, the normal background (i.e. what is normally found inside of buildings) is also considered during the evaluation of samples results. Background concentrations of combustion byproducts are typically found inside of residences, due to multiple sources/influences that are found and utilized daily in a home or that infiltrate from outdoors. Typical indoor sources include, but are not limited to, wood stoves/fireplaces, candle burning, cooking, incense burning, and smoking. Outdoor sources include barbeques/outdoor stoves, fire pits, local vehicular traffic, controlled and uncontrolled burns, and previous wildfires.

For the purposes of this project, samples with particle concentrations of combustion byproduct particulate above Typical – Upper Background and/or samples with large fire combustion particles or wildfire indicator particles present are considered impacted.

### 4.3 Combustion Byproduct Sample Collection

J.S. Held developed the following sampling strategy:

<u>Targeted Sampling:</u>
Locations identified for sample collection by J.S. Held were selected based on the following criteria:

- Surfaces that display significant visible wildfire particulate deposition were not sampled because impact was confirmed via visible observation.
- Surfaces at points of entry to the structure (i.e.: entry doors, windows, vents, etc.) were inspected and sampled if no significant visible wildfire particulate deposition was observed.
- Surfaces located adjacent to areas with visible deposition and surfaces located adjacent to points of entry to the structure were sampled to determine the extent of impact.
- Surfaces where CBP, particulate, and other environmental dust would typically collect (visible cobwebs, in corners, on window casing/trough/sills, tops of cabinets, tops of appliances, countertops, shelves, ledges, baseboards, etc.) were sampled to determine if wildfire related particulate is present.
- Surfaces away from points of entry with no visible wildfire related particulate deposition were sampled to determine the extent of impact and assist in identifying areas of impact from the wildfire.
- Sample locations on surfaces were selected based on the presence of visible dust/particulate accumulation to determine if the visible dust/particulate contains wildfire related particulates.

Surface samples were collected utilizing Bio-Tape™ tape lifts inserted into a rigid plastic container, placed individually into plastic bags and sealed, recorded onto a chain of custody, and shipped by courier to EAA located in Bay City, Michigan. EAA is an American Industrial Hygiene Association (AIHA) accredited laboratory for analysis, which includes Polarized Light Microscopy (PLM) and Reflected Light Microscopy. A total of forty (40) samples were collected throughout the property as follows:

- Eight (8) from various horizontal surfaces within the basement level.
    - One (1) from an HVAC component.
    - Three (3) from contents.
    - Two (2) from a horizontal surface away from points of entry.
    - Two (2) from a horizontal surface at or adjacent to points of entry.
- Ten (10) from various horizontal surfaces within the main level.
    - One (1) from an HVAC component.
    - Three (3) from contents.
    - Three (3) from a horizontal surface away from points of entry.
    - Three (3) from a horizontal surface at or adjacent to points of entry.
- Eleven (11) from various horizontal surfaces within the upper level.
    - Six (6) from contents.
    - Two (2) from a horizontal surface away from points of entry.
    - Three (3) from a horizontal surface at or adjacent to points of entry.
- Three (3) from various horizontal and vertical surfaces on the exterior.
- Three (3) from various horizontal surfaces within the attic.
- Five (5) from surfaces within the garage.
    - One (1) from a horizontal surface.

- Four (4) from contents.

The laboratory analytical report and associated chain of custody are included in **Appendix B**, and sample location diagrams are included in **Appendix C.**

### 4.4 Combustion Byproduct Sample Results

Analytical results for the forty (40) samples collected at the subject property were reviewed by a J.S. Held Certified Industrial Hygienist (CIH) and/or Certified Fire and Smoke Consultant (CFSC). The laboratory identified the presence of fire/combustion particle concentrations in the Atypical or Elevated ranges and/or the presence of wildfire/structure fire indicators in the following twenty-three (23) samples collected at the subject property:

- Exterior – Basement Level; Dog door (TL-1).
- Exterior – Front Entry; Siding (TL-2).
- Exterior – Garage; East light fixture (TL-3).
- Basement Level – Living Room Area, west windowsill (TL-4).
- Basement Level – Bedroom Area, south sliding door trough (TL-5).
- Main Level – Front Door, trough (TL-12).
- Main Level – Dining Room, south windowsill (TL-14).
- Main Level – Family Room, doormat (at back door) (TL-16).
- Main Level – Family Room, ottoman (top) (TL-17).
- Main Level – Family Room, couch (north; armrest) (TL-18).
- Main Level – Laundry Room, lower cabinet (top) (TL-19).
- Main Level – Hallway, HVAC return vent (TL-20).
- Upper Level – Office, west windowsill (TL-22).
- Upper Level – Office, floor (under window, adjacent to HVAC supply register (TL-23).
- Upper Level – Master Bedroom, floor under window (TL-28).
- Attic – Insulation (under roof vent) (TL-33).
- Attic – Horizontal Surface (under roof vent (TL-34).
- Attic – Water Pipe (top, away from vent) (TL-35).
- Garage – Boots (in bin) (TL-36).
- Garage – Beanie (in bin) (TL-37)
- Garage – Slippers (in box) (TL-38).
- Garage – Storage Case (top; at side door) (TL-39).
- Garage – Power Strip, north wall (between garage doors) (TL-40).

## 5.0 DOCUMENT REVIEW

J.S. Held reviewed the following document regarding this matter:

- ***Smoke Testing Report*** prepared by Certified IAQ Professionals (CIAQP), dated June 13, 2022, and addressed to Geoffrey Hart, 122 Vista Lane, Louisville, CO 80027.

### 5.1 Review Summary

***CIAQP Inspector and Observations***
The CIAQP report documents the visual inspection and sampling performed by CIAQP on April 27, 2022.

- The inspector that performed the assessment and prepared the report was identified as Jeanine Humphrey, an American Council and Accredited Certification (ACAC) Council-Certified Fire and Smoke Damage Assistant Technician (CFSAT).
  - ➢ The CFSAT is a vocational certification which can be acquired by an individual with “verified knowledge; field experience not required.”
  - ➢ According to an inquiry into the CFSAT certification, ACAC stated that “A CFSAT would be working under the supervision of a CFST (Council-Certified Fire and Smoke Damage Technician) or CFSC (Council-Certified Fire and Smoke Damage Consultant). It is more an assistant type certification with little experience.”

- The CIAQP report states that “observable soot/char/ash in windowsill and window tracks, doors and door tracks throughout the home” and “signs of structural damage to the frames and seals” of all windows and doors.
  - ➢ CIAQP did not collect any samples for wildfire-related smoke particulate analysis to verify that what they observed at the residence is in fact soot, char and/or ash. Even the most seasoned and experienced inspector cannot visually confirm the presence of soot, char and/or ash without microscopic analysis, so it is unlikely that a CFSAT would be able to do so.
  - ➢ While potential soot/char/ash may have been present in the window troughs and windowsill, there was no structural investigation performed by CIAQP (or its subcontractors) to validate that window frames and seals were structurally damaged.

- The CIAQP report also states that “upstairs ceiling lights show signs of “popping” as a results of overpressure from smoke infiltration into the attic.”
  - ➢ While smoke may have potentially migrated into the attic, the “popping” stated by CIAQP may have been from poor light installation. No smoke trails were observed around the bases of the light fixtures on the ceiling and not all hanging lights (chandeliers) upstairs display the “popping” observed by CIAQP.

***CIAQP Heavy Metal Sampling***

The sampling performed by CIAQP was reported to include "Heavy Metal testing on walls in the home to determine if heavy metals levels were above ambient thresholds and to inform the breath and scope of remediation."

- The CIAQP report includes the laboratory analytical reports prepared by Enthalpy Analytical and the chain of custody (COC) submitted with the samples.
- According to the COC, CIAQP only collected one (1) grab wipe sample for heavy metals analysis. The residence is a three level, 2,214 square foot home with various types of materials, finishes, contents, etc.
    - ➢ The collection of one (1) sample is not consistent with the CIAQP claim of "testing on walls (plural) in the home." Furthermore, the result for one (1) sample does not allow for the proper assessment and characterization of conditions throughout the home.
    - ➢ The AIHA Technical Guide for Wildfire Impact Assessments states that "the investigator should collect a sufficient number of samples to support the purpose of the investigation and to establish an accurate representation of the conditions in the building. Sampling various types of materials such as hard horizontal surfaces, porous materials, fabrics, curtains, carpet and HVAC filters can help to document wildfire debris exposure." Based on AIHA guidelines, an insufficient number of samples were collected to establish an accurate representation of the conditions at the property.
    - ➢ No field or media blanks were submitted to the laboratory. Blank samples are necessary to validate the results obtained by verifying that the media is not contaminated, that proper sampling methodology was employed, the sample was handled properly by the sampler and the laboratory, and that proper analytical methods were used.

- The chain of custody for the heavy metals sample is missing sample location, description, and area/volume and CIAQP does not provide any of this sample information within the report.
    - ➢ Because no sample locations or descriptions are provided, there is no way to evaluate what areas of the residence are represented by the sample collected. Furthermore, the location of the sample may provide some insight as to why the concentrations detected are present. For example: higher concentrations of heavy metals would be expected in the garage as compared to the kitchen of a residence.
    - ➢ Additionally, the location of the sample must be taken into account according to EPA standards. For example: the lead dust standard for interior floors as established by the EPA is less than 10 micrograms per square foot, but the standard for interior windowsills is 100 micrograms per square foot. Without knowing what surface was sampled it is impossible to apply the correct standard.
    - ➢ Without the sample area/volume, the laboratory is unable to provide quantifiable results. Because the area/volume is not provided, the results for

the heavy metals are reported in micrograms per sample rather than micrograms per square foot. The laboratory report indicated the presence of heavy metals ranging from less than 0.2 to 71.4 micrograms per sample in the one (1) sample collected. These results do not allow for comparison to regulatory standards that are based on concentrations by area. For example: the lead dust standard for interior floors as established by the EPA is less than 10 micrograms per square foot, which is not comparable to the laboratory reported result of 2.84 micrograms per sample.

- Furthermore, the sample area/volume will have a major impact on the results. For example, if the highest concentration detected of 71.4 micrograms per sample was for a sample size of 1 square foot the result would be 71.4 micrograms per square foot but if the sample size was 10 square feet the result would be 7.14 micrograms per square foot.

- CIAQP incorrectly reported the heavy metals results in milligrams per kilogram (mg/kg) without converting the laboratory reported results that were provided in micrograms per sample.
  - One milligram is equal to 1,000 micrograms, so for an example the arsenic result of 71.4 micrograms per sample reported by the laboratory is equal to 0.0714 mg per sample, not 71.4 mg/kg as reported by CIAQP.
  - Additionally, because the sample area/volume was not provided the results cannot be concerted to mg/kg.
  - There are various potential sources for the heavy metals identified in the sample collected by CIAQP and it is not uncommon to have background concentrations of heavy metals in a residence. Again, because the concentration cannot be determined, and the sample location is not provided, it is impossible to evaluate if the concentrations identified should be considered background or elevated. Comparison (or background) samples are necessary to attempt to clarify the source or time period with which the heavy metals were introduced to the residence.

***CIAQP Volatile Organic Compounds (VOCs) Sampling***

The VOC sampling performed by CIAQP was "conducted on each floor of the home to determine if toxigenic chemicals were present in the home to inform scope of remediation."

- The CIAQP report includes the laboratory analytical reports prepared by Advanced Chemical Sensors (ACS). The laboratory analyzed the samples for more than 60 types of VOCs.

- No chain of custody for the VOC samples is included in the report and CIAQP does not provide any sample collection information within their report either.
  - Without a chain of custody, it is impossible to validate the sample or verify that the sample was collected at the residence, what was sampled, where the

sample was taken, how the sample was handled, or anything else about the sample.

- Based on the laboratory report, it appears that CIAQP collected a total of three (3) air samples (one (1) from each level of the home) for VOC analysis. It appears that each sample ran for approximately twenty-four (24) hours.
  - ➢ No outside or background sample was collected to determine if the VOC concentrations identified within the residence are elevated in comparison to background concentrations.
  - ➢ No field blanks were submitted to the laboratory. Blank samples are necessary to validate the results obtained by verifying that the media is not contaminated, that proper sampling methodology was employed, the sample was handled properly by the sampler and the laboratory, and that proper analytical methods were used.

- The laboratory reported the following results for the VOC samples:
  - Acetone was identified in all three (3) samples at concentrations ranging from 8.42 to 10.01 parts per billion (ppb).
  - Ethyl Alcohol was identified in all three (3) samples at concentrations ranging from 125.48 to 150.55 ppb.
  - Isopropyl Alcohol was identified in all three (3) samples at concentrations ranging from 58.73 to 80.56 ppb.
  - Toluene was identified in two (2) of the samples at concentrations ranging from 2.43 to 3.04 ppb.
  - None of the other 60 plus VOCs included in the analysis were identified in the samples collected at the subject property.

- CIAQP reported the following results for the VOC samples:
  - Acetone at 0.02786 parts per million (ppm).
  - Ethyl Alcohol at 0.40501 ppm.
  - Isopropyl Alcohol at 0.20861 ppm.
  - Toluene at 0.00547 ppm.
    - ➢ It appears that CIAQP added the detected concentrations of each constituent for each sample and then took those totals and converted them from ppb to ppm to allow for comparison to the "PEL Limit – OSHA/NIOSH" as listed in the VOC results table in the CIAQP report. The air samples collected by CIAQP were discreet samples that were collected simultaneously and should not have been added together to determine concentrations. Rather the samples should be considered separate and independent of each other, and the concentrations should have been reported separately or as ranges (for example toluene results should be reported as ranging from 0.00243 to 0.00304 ppm, not 0.00547 ppm).
    - ➢ Furthermore, the PELs that CIAQP compares the results to is an 8-hour time weighted average (TWA). As such, in order to make a comparison to the PELs

the results for the samples collected by CIAQP should have been converted to an 8-hour TWA.

- There are various potential sources for the VOCs identified in the samples collected by CIAQP and it is not uncommon to have background concentrations of VOCs in a residence. In fact, CIAQP states that the "VOCs found in the home" "were within standard ranges and found in cleaning agents."
- CIAQP goes on to state that "Toluene is typically found from combustion sources and was most likely caused by the fire." This statement contradicts their prior statement regarding the VOCs being found in cleaning agents and it ignores the fact that none of the other 60 plus VOCs were identified, many of which are also typically related to combustion sources. There are numerous potential sources of toluene other than combustion.

***CIAQP Dioxins Sampling***

The sampling performed by CIAQP was reported to include "Dioxin (TCDD) testing throughout the home to determine if carpets, soft furnishings and other soft goods were salvageable and to inform the breath and scope of remediation."

- No chain of custody for the dioxin sample is included in the report and CIAQP does not provide any sample collection information within their report.
  - Without a chain of custody, it is impossible to validate the sample or verify that the sample was collected at the residence, what was sampled, where the sample was taken, how the sample was handled, or anything else about the sample.
  - Because no sample locations are provided, there is no way to evaluate what areas of the residence are actually represented by the samples collected. Furthermore, the location of the sample may provide some insight as to why the concentrations detected are present.

- The CIAQP report includes the laboratory analytical reports prepared by Enthalpy Analytical. CIAQP collected one (1) bulk carpet sample for dioxin analysis. The residence is a three level, 2,214 square foot home with various types of materials, finishes, contents, etc.
  - The collection of one (1) sample is not consistent with their claim of "testing throughout the home." Furthermore, the result for one (1) sample does not allow for the proper assessment and characterization of conditions throughout the home.
  - The AIHA Technical Guide for Wildfire Impact Assessments states that "the investigator should collect a sufficient number of samples to support the purpose of the investigation and to establish an accurate representation of the conditions in the building. Sampling various types of materials such as hard horizontal surfaces, porous materials, fabrics, curtains, carpet and HVAC filters can help to document wildfire debris exposure." Based on AIHA guidelines, an insufficient number of samples were collected to establish an accurate representation of the conditions at the property.

- No field or media blanks were submitted to the laboratory. Blank samples are necessary to validate the results obtained by verifying that the media is not contaminated, that proper sampling methodology was employed, the sample was handled properly by the sampler and the laboratory, and that proper analytical methods were used.

- The laboratory report indicated the presence of dioxins/furans ranging from non-detect to 55.4 picograms per gram in the one (1) sample collected at the property.
  - The laboratory reported that "there is insufficient information for a definitive determination that the dioxin/furan content of this sample originates from a combustion source." According to the National Institute of Environmental Health Sciences (NIEHS), dioxins are mainly byproducts of industrial practices. They are produced through a variety of incineration processes, including improper municipal waste incineration and burning of trash, and can be released into the air during natural processes, such as forest fires and volcanoes.
  - While the results yielded detectable concentrations of dioxins/furans it is unknown what levels of dioxins/furans were present at the residence before the Marshall Fire (wildfire). Comparison (or background) samples are necessary to attempt to clarify the source or time period with which the dioxins/furans were introduced to the residence.

***CIAQP Conclusions/Recommendations***

The CIAQP report includes "Conclusions and Remediation Recommendations" as well as "Recommended Remediation Activities."

- CIAQP states that "(dioxin) exposed textiles and soft goods cannot be remediated and must be deemed unsalvageable and removed from the home."
  - However, because only one (1) sample was collected from an undocumented location with an unknown sample area/volume, dioxin impacts have not been confirmed or defined.

- CIAQP states that "PRV (Post Remediation Verification) testing once remediation is complete; to include…Heavy Metal Wipe to ensure no elevated Heavy Metals Levels are left behind."
  - However, because only one (1) sample was collected from an undocumented location with an unknown sample area/volume, heavy metals impacts have not been confirmed or defined.

- CIAQP recommends "full remediation of the home."
  - However, the limited sampling performed by CIAQP is not sufficient to evaluate the extent of impact and thus the scope of remediation cannot be determined. Because the extent of impact has not been determined, none of the recommendations in the CIAQP can be justified without additional sampling.

- CIAQP recommends "encapsulation and repainting of all painted surfaces in the home to ensure any post-cleaning toxigenic chemical remaining is appropriately sealed" as well as "encapsulation of all exposed surfaces in the attic, garage and any exposed subfloor material."
  - ➢ Again, based on the limited sampling it is unknown if "all" or any surfaces have been impacted so this all-inclusive scope cannot be justified based on the limited sample size. Furthermore, sealing the surfaces is not warranted if proper remediation is performed and sealing in residual contaminants is not the preferred remediation methodology. Post-remediation verification (PRV) sampling should be performed rather than assuming cleaning was not effective.

- CIAQP recommends "disposal of any fibrous/soft goods in the home," "plastics used in food preparation, store or consumption," "disposal of all kitchen appliances" and "disposal of outdoor grill."
  - ➢ However, again the limited sampling performed by CIAQP is not sufficient to evaluate the extent of impact and thus the scope of remediation cannot be determined. Because the extent of impact has not been determined, none of the recommendations in the CIAQP can be justified without additional sampling.

- CIAQP states that "on the interior of the home, negative pressure should be established in the work areas…."
  - ➢ However, negative pressure is not warranted or necessary to remediate the residence based on the contaminants identified if remediation is performed in accordance with industry standards using HEPA filtered vacuums and wet wiping methods. Furthermore, the negative pressure is not necessary for bystander protection if the occupants are not present during the remediation as recommended by CIAQP.

## 5.2 Document Review Conclusions and Recommendations

Based upon a review of the report prepared by CIAQP, the following can be concluded:

The sampling performed by CIAQP is not sufficient to properly assess smoke-related impacts to the residence.

- ➢ An insufficient quantity of samples was collected to determine the presence or extent of impact.
- ➢ The sample collection methodology employed is flawed and the reporting is inaccurate, making the sample results unverifiable and unreliable.

The recommendations provided by CIAQP are not justified based on the limited and flawed sampling performed by CIAQP.

- Because the extent of impact has not been determined, none of the recommendations in the CIAQP can be justified without additional sampling.

## 6.0 LIMITATIONS

J.S. Held recorded property conditions "as-is" during the assessments. J.S. Held did not perform any destructive investigations of concealed/inaccessible areas/conditions. Recommendations provided in this report are based upon the condition of the areas reported to be impacted as evaluated at the time of the assessment.

## 7.0 CONCLUSIONS AND RECOMMENDATIONS

J.S. Held performed a smoke damage assessment of the Geoffrey Hard residence located at 122 Vista Lane in Louisville, Colorado, to evaluate damages as a result of the Marshall Fire (wildfire). The assessment included visual inspection of the subject property and collection of surface tape lift samples for combustion byproducts to establish patterns of smoke impact and provide a restoration protocol, as necessary. J.S. Held also performed a document review of a Smoke Testing Report prepared by CIAQP. The following is a summary of the assessment findings:

- Visible wildfire smoke particulate deposition observed in the following areas at the subject property:
  - Interior floor surfaces at entry points and in the vicinity of HVAC floor supply vents.
  - Horizontal surfaces at points of entry, including on baseboards, shelves, counters, and contents in the vicinity of windows and exterior doors.
  - Horizontal surfaces and on boxes of contents within the garage.
  - Insulation and horizontal surfaces within the attic.

  No visible or physical signs of smoke pressurization impacting the wall or ceiling cavities were observed at the subject property at the time of the inspection. Wipe testing of vertical and ceiling surfaces did not identify the presence of residue on exposed vertical and ceiling surfaces at the subject property.

- The laboratory identified the presence of fire/combustion particle concentrations in the Atypical or Elevated ranges and/or the presence of wildfire/structure fire indicators in twenty-three (23) surface tape lift samples collected at the subject property, indicating smoke impacts to the following areas at the subject property:
  - Exposed exterior surfaces.
  - Exposed interior surfaces at points of entry (windows and exterior doors), including contents in the vicinity of points of entry.
  - Exposed HVAC surfaces.
  - Exposed attic surfaces and contents.
  - Exposed garage surfaces and contents.

- The document review identified numerous technical issues and deficiencies with the report prepared by CIAQP.
  - None of the sampling performed by CIAQP can be relied upon to evaluate smoke impacts at the subject property.
  - None of the laboratory results for the samples collected by CIAQP are indicative of smoke impacts.
  - The recommendations provided by CIAQP are not justified based on the limited and flawed sampling performed by CIAQP.

Based on these findings, wildfire smoke impacts were identified in the following areas:

- Exposed exterior surfaces.
- Exposed interior horizontal surfaces throughout the property.
- Exposed horizontal surfaces throughout the garage.
- Exposed horizontal surfaces and insulation throughout attic.
- HVAC system.
- Exposed contents.

All impacted items and contents are considered salvageable and cleanable; however, replacement of some items may be more cost effective than cleaning.

Based on these findings, J.S. Held recommends cleaning impacted areas/surfaces following the protocol provided below in **Section 8.0**.

## 8.0 SMOKE DAMAGE RESTORATION PROTOCOL

The following protocol contains the recommendations for the generalized cleaning to address the presence of combustion byproduct deposition on surfaces in a stepwise manner. The contractor utilized shall possess and furnish all necessary equipment, materials and labor to adequately perform the specified services. This cleaning and removal protocol does not include recommendations or requirements for inspection of electrical, or any other building code requirements.

### 8.1 General Asbestos and Lead Information

Building materials can contain asbestos, regardless of date of construction. Disturbance, removal, handling and/or disposal of asbestos is regulated by OSHA, EPA, and the Colorado Department of Public Health and Environment (CDPHE). Materials that will be disturbed during restoration activities must be tested for asbestos by accredited personnel. Building materials can also contain lead, regardless of date of construction. For buildings built prior to 1978, the potential for lead-based paint (LBP) exists. The

disturbance of materials containing lead is regulated by OSHA and must be performed by properly trained workers using lead safe work practices.

### 8.2 Industry Standards and Guidelines

This restoration and remediation protocol is based off industry standard for combustion byproducts, and adheres to the following guidelines and organization's recommendations:

1. Restoration Industry Association Guidelines for Fire and Smoke Damage Repair (second edition).
2. Environmental Implications of Combustion Processes, Chapter 3 Soot, CRC Press, Boca Raton, FL, Puri, I.K. 1993.
3. National Concrete Masonry Association, Cleaning Concrete Masonry TEK 8-4A, 2005.
4. Los Angeles County Department of Public Health, How to Clean up Smoke and Soot from a Fire, June 11, 2013.
5. American Council for Accredited Certification (ACAC).
6. American Industrial Hygiene Association (AIHA).
7. Occupational Safety and Health Administration (OSHA); and,
8. National Institute for Occupational Safety and Health (NIOSH).

### 8.3 General Process

Below are standard items that are applicable to most restoration and remediation projects but may not necessarily be performed in this order. Changes are dictated based on each individual project.

1. Establish controlled access to work areas.
2. Install critical barriers as necessary to prevent migration of combustion byproducts.
3. Ensure all workers entering the work area are aware of the hazards and are properly trained.
4. Use proper PPE, to include gloves and dust masks, where necessary.
5. NO EATING OR DRINKING in the work area.
6. Ensure Safety Data Sheets (SDS) for all cleaning products used are available for review in the workplace.
7. Remove or protect all contents that are not to be cleaned in place.
8. Perform cleaning for combustion byproducts via surface wiping and/or HEPA vacuuming.
9. The HEPA filter vacuum cleaner should be equipped with a filter system capable of collecting and retaining dusts. The filter should be of 99.97% efficiency for retaining particles of 0.3 microns.
10. Perform post-restoration verification assessment and sampling.

### 8.4 Scope of Work

Activities for this project include the cleaning of the following specific areas/surfaces/materials that have been identified to be impacted with char, ash, and/or soot:

**Interior**

- Exposed floors:
  - HEPA vacuum exposed floors throughout the interior of the property.
  - Following HEPA vacuuming, wipe clean* exposed resilient flooring (tile, laminate, sheet vinyl, etc.).
- Exposed horizontal surfaces:
  - HEPA vacuum exposed horizontal surfaces throughout the interior of the property.
  - Following HEPA vacuuming, wipe clean* exposed horizontal surfaces.
- HVAC System:
  - The HVAC should be cleaned by an appropriately licensed HVAC contractor, and in accordance with National Air Duct Cleaners Association (NADCA) guidelines and standards.
  - Replace HVAC return filters. It is recommended to utilize filters with a MERV rating of 11 or higher in the HVAC system to limit smoke particulate and odors until ambient air quality improves.

**Contents** (in garage and throughout the entire interior of the property):

- All impacted items and contents (soft/porous and hard) are considered salvageable and cleanable; however, the replacement of some items may be more cost effective than cleaning.
- Contents and consumables located in closets, cabinets and drawers do not require cleaning or replacement.
- Dispose of all exposed consumable items from the property.
- Contents to be replaced do not need to be cleaned.
- HEPA vacuum exposed surfaces of contents to be salvaged.
- Following HEPA vacuuming, wipe clean* exposed surfaces of non-porous contents to be salvaged.
- Specialized cleaning may be required for any porous contents that will be salvaged.
- Specialized cleaning or replacement may be required for any electronics or appliances; this is to be determined by applicable professional following industry standards and guidelines.

**Garage**

- Exposed surfaces throughout:
  - HEPA vacuum exposed horizontal surfaces throughout.

- Following HEPA vacuuming, wipe clean* exposed horizontal and vertical surfaces throughout.

**Attic**

- Remove and replace exposed blown-in and/or batt insulation.
  - HEPA vacuum exposed surfaces within the attic. – including but not necessarily limited to floor/deck, structural members (beams, joists, etc.), mechanical equipment components (ducts, light fixtures, etc.).

**Exterior**

- Exterior exposed surfaces:
  - Clean* the exterior using low-pressure wash. Clean* and rinse, working from top to bottom, including but not necessarily limited to roof components, walls, doors, windowsills, window troughs, etc.
  - Wash and rinse water should be captured, filtered and properly disposed of in accordance with any local regulatory requirements.

* Any cleaning detergents, solutions, or products must be approved by the owner or owner's representative prior to application and must be used in such a way that they do not alter or damage the surface, material, or item. A small discreet test area should be used to evaluate the potential impacts prior to cleaning.

### 8.5 Combustion Byproduct Cleaning Protocol

Perform cleaning of impacted areas/surfaces/materials in the work areas as identified in this protocol using the following work procedures/practices:

1. Use a HEPA vacuum to clean non-porous horizontal surfaces of impacted areas/materials.
2. Use a HEPA vacuum to clean horizontal and vertical porous surfaces of impacted areas/materials.
3. Perform HEPA-vacuuming by holding the nozzle slightly off the surface of the item. Utilization of a brush attachment can drive particles into porous surfaces such as fabric and carpet.
4. HEPA-vacuum surfaces and items located at the top of the room and proceed downward.
5. Wipe clean all non-porous surfaces with an applicable cleaning detergent* and all porous surfaces with a dry soot removal sponge.
6. After completion of restoration cleaning, a post-restoration verification assessment and sampling should be conducted by J.S. Held's Industrial Hygienist. A visual inspection and combustion byproduct surface tape lift sampling will be performed to ensure that restoration was successfully completed according to the protocol.

* Any cleaning detergents, solutions, or products must be approved by the owner or owner's representative prior to application and must be used in such a way that they do not alter or damage the surface, material, or item. A small discreet test area should be used to evaluate the potential impacts prior to cleaning.

**8.6 Decontamination Area (General Information)**

Decontamination shall be performed to prevent migration of combustion byproducts, dust and debris into other areas of the property.

**8.7 Work Area Preparation**

Where restoration activities only include combustion byproducts, work area controls should be established to prevent the spread of combustion byproducts, dust and debris.

1. HVAC Systems - All HVAC equipment in or passing through any restoration work area shall be shut down, and preventative measures shall be taken to prevent accidental start-ups. All intake and exhaust openings shall be sealed with at least one layer of 6-mil poly sheeting. The seals shall be installed in such a manner as to guarantee that the seals shall remain in place for the duration of the project.
2. Movable Objects - All contents and moveable objects should be removed from the work area.

**8.8 Post-Restoration Verification Criteria**

A post-restoration verification (PRV) assessment and sampling should be performed following completion of cleaning efforts. The restoration will only be considered complete, and the areas clean after all of the specified criteria are met. If any of the criteria is not met, then the restoration is not acceptable, and re-cleaning will be conducted at the contractor's expense to include all costs associated with re-sampling.

The criteria for post-restoration verification are as follows:

- No visible signs of fire damage.
- No visible signs of smoke impacts, including no dust or particulate.
- All work has been completed in compliance with the restoration protocol; and
- Post-restoration sampling confirms remediation has "passed" based on the following criteria.

**PRV Sampling:**

Tape samples for combustion byproducts should be collected following fire restoration activities. All samples should be submitted to an accredited laboratory that can perform qualitative analysis for combustion byproduct (char soot and ash) particulate

concentrations utilizing Polarized Light Microscopy (PLM) and Reflected Light Microscopy. Additionally, air monitoring or sampling should be performed to measure airborne particulate matter and VOC concentrations inside the subject property.

Restoration activities will be considered complete after the following testing criteria are met:

- Surface tape lift samples indicate no combustion byproducts present above Typical – Upper Background levels and no wildfire indicators present inside the subject property.
- Air monitoring indicates no elevated concentrations of airborne particulate matter or VOCs inside the subject property.