**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-02554

JENNIFER DAWN HART and GEOFFREY SEBASTIAN HART,

Plaintiffs,

v.

STATE FARM FIRE AND CASUALTY COMPANY,

Defendant.

---

**COMPLAINT**

---

Plaintiffs Jennifer Dawn Hart and Geoffrey Sebastian Hart ("Plaintiffs"), through their counsel, respectfully plead their Complaint against Defendant State Farm Fire and Casualty Company ("Defendant"). Pursuant to the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury.

**JURISDICTION**

1. Plaintiffs are domiciled in Boulder County, Colorado. Plaintiffs are citizens of Colorado.

2. Defendant is an Illinois corporation with a principal place of business in McLean County, Illinois. Defendant is a citizen of Illinois.

3. The amount in controversy exceeds $75,000.00, exclusive of interest and costs. *See* ¶¶ 82, 96, 101, 108, 116.

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

5. This Court has personal jurisdiction over Defendant because it issued the subject insurance policy in Colorado, and the insured property is located in Colorado.

6. Venue is proper in this District because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Colorado, and the insured property is located in Colorado.

## FACTUAL ALLEGATIONS

7. Plaintiffs incorporate the allegations stated above.

8. Plaintiffs have owned their family home at 122 Vista Lane, Louisville, CO 80027 (the "Home") since December 10, 2006.

9. On or around December 10, 2021, Defendant offered to sell Plaintiffs homeowners insurance for their Home in exchange for the payment of insurance premiums.

10. Plaintiffs accepted Defendant's offer, and paid Defendant their insurance premiums to Defendant.

11. Defendant issued to Plaintiffs Policy No. 06-EN-E071-0 (the "Policy"), effective December 10, 2021 to December 10, 2022, thus extending to Plaintiffs homeowners insurance coverage.

### The Marshall Fire

12. On December 30, 2021, the most destructive wildfire in Colorado history blazed through eastern Boulder County.

13. Straight-line winds exceeding 110 miles per hour spread fire, smoke, ash, soot, and char throughout Louisville, Superior, and neighboring communities.



Photograph of the Marshall Fire taken on December 30, 2021 from Lookout Mountain in Golden, CO, approximately fifteen miles south of the Fire.

14. Over 30,000 Coloradans were forced to evacuate their homes.

15. The Governor of Colorado declared a State of Emergency.

16. The President of the United States issued a Major Disaster Declaration.

17. The catastrophe became known as the "Marshall Fire."

18. The Boulder County Office of Emergency Management estimated that the Marshall Fire destroyed 1,084 homes.

19. Thousands more homes were penetrated by toxic smoke, ash, soot, and char.

20. The Boulder County Office of Emergency Management warned:

> All ash contains small amounts of cancer-causing chemicals. Ash and debris from burned structures may contain toxic substances because of synthetic and other materials present in buildings. Older buildings may contain asbestos and lead.

> Ash consists of ultra-fine particles that can go deep into the lungs where they can enter the bloodstream and damage internal organs. Even highly efficient respiratory protection such as N95 masks can allow small amounts of ash to reach your lungs.

21. The University of Colorado Boulder Cooperative Institute for Research in Environmental Sciences warned:

> Health risks in fire-damaged areas include particles, asbestos, lead, and chemical residues.
>
> Fires emit a lot of particles (also known as Particulate Matter, PM) and gasses. Smaller sizes of PM penetrate deep into the lungs and are harmful to human health. Some of the gases emitted and created in fire plumes are Volatile Organic Compounds (VOCs). These compounds create the smell of a fire plume (and linger post-fire). Many of the gases emitted by active fires are also harmful to human health.

**<u>Plaintiffs' Home</u>**

22. The Marshall Fire blazed directly through Plaintiffs' subdivision.



Video footage taken of Plaintiffs' neighborhood on December 30, 2021. Plaintiffs' Home is the second structure from the left.

23. Sixty-two homes in Plaintiffs' subdivision burned to the ground.



Aerial footage of Plaintiffs' subdivision taken on or around December 31, 2021. Plaintiffs' Home is in yellow.

24. Fortunately, Plaintiffs' Home remained standing.

25. However, when Plaintiffs were finally allowed to return Home, they smelled a strong smoke odor inside their Home. The smoke odor did not exist before the Marshall Fire.

26. Plaintiffs observed piles of ash and soot inside their Home. The piles of ash and soot did not exist before the Marshall Fire.

27. Plaintiffs observed ash and soot inside their windowpanes. No windowpanes contained ash and soot before the Marshall Fire.

28. Plaintiffs observed that their windows were warped and jammed shut. Plaintiffs' windows opened and closed without issue before the Marshall Fire.

29. Plaintiffs observed that the heated floor in their upstairs bathroom no longer functioned correctly. The heated floor functioned without issue before the Marshall Fire.

30. Plaintiffs observed that the pipes in their basement had leaked, causing water damage to the floor below. The pipes did not leak before the Marshall Fire. The floor was not damaged before the Marshall Fire.

31. Plaintiffs observed that the Dry-B-Lo system on their deck was no longer functioning, and leaking water into the cedar ceiling below. The deck did not leak before the Marshall Fire.

32. Plaintiffs observed that their paver patio and paver driveway were both covered and infiltrated with ash, soot, and char. The paver patio and paver driveway were not covered or infiltrated with ash, soot, or char before the Marshall Fire.

33. Plaintiffs observed that their personal property was covered in ash, soot, and char. The ash, soot, and char did not exist before the Marshall Fire.

34. Plaintiffs' Home was not habitable. Accordingly, Plaintiffs were forced to temporarily relocate. As of date, Plaintiffs remain displaced.

**Plaintiffs' Policy**

35. The Policy's Coverage A – Dwelling provides:

> ***We*** will pay for accidental direct physical loss to the property described in Coverage A . . .

36. The Policy's Coverage B – Personal Property provides:

> ***We*** will pay for accidental direct physical loss to the property described in Coverage B caused by the following perils . . . 1. **Fire** . . . 2. **Windstorm** . . . 7. **Smoke** . . . 10. **Falling objects** . . . 12. **Abrupt and accidental discharge or overflow** . . . 14. **Freezing** . . . [and] 16. **Breakage of glass.**

37. The Policy's Coverage C – Loss of Use provides:

> **Additional Living Expense.** When a ***loss insured*** causes the ***residence premises*** to become uninhabitable, ***we*** will pay the reasonable and necessary increase in cost incurred by an ***insured*** to maintain their normal standard of living for up to 24 months.

**<u>Plaintiffs' Insurance Claim</u>**

38. On December 30, 2021, Plaintiffs contacted their State Farm agent, David DiOrio, to let him know they would need to open a claim.

39. On January 3, 2022, the Colorado Division of Insurance issued Bulletin No. B-5.43, concerning Marshall Fire claims handling, which provided in part:

> [P]articulate infiltration and contamination must be addressed.
>
> When handling the smoke, soot, ash, or water damage claims, the Division directs insurers to consider the related long-lasting effects on electronics, furniture and other property when estimating the total damage. Merely cleaning the walls and property will not necessarily return the property to pre-loss condition. Companies must consider their policyholders' concerns about faulty wiring, inoperable electronics, and soft material contamination. Health related issues, including respiratory difficulties, directly caused by exposure to smoke, soot, ash, or mold are damage and loss, and insurers shall consider reasonable substantiation to make appropriate coverage decisions.

40. Defendant assigned Claim No. 06-28Z0-27L to Plaintiffs' insurance claim.

41. On January 13, 2022, Defendant's adjuster, Truong "Dominic" Nguyen, inspected Plaintiffs' Home.

42. During his inspection, Plaintiffs exhibited the damage to Mr. Nguyen and expressed concern about particulate infiltration and contamination. They informed Mr. Nguyen that they were concerned for their and their children's health and safety.

43. Defendant, however, did not investigate, inspect, or test for particulate infiltration and contamination inside Plaintiffs' Home. Instead, Defendant limited its inspection to a visual investigation.

44. On or around January 24, 2022, Defendant issued an estimate totaling just $47,650.80 (Line Item Total) with a Net Actual Cash Value Payment (less depreciation and deductible) of $43,712.73. Defendant's estimate was largely limited to cleaning the surfaces of Plaintiffs' Home.

45. Defendant's estimate did not cover restoring the surfaces of Plaintiffs' Home to their pre-loss condition.

46. Defendant's estimate did not cover restoring the windows and doors in Plaintiffs' Home to their pre-loss condition.

47. Defendant's estimate did not cover restoring the plumbing in Plaintiffs' Home to its pre-loss condition.

48. Defendant's estimate did not cover restoring Plaintiffs' deck, patio, or driveway to their pre-loss condition.

49. Defendant's estimate did not cover restoring Plaintiffs' insulation and air ducts to their pre-loss condition.

50. Defendant's estimate did not even address the restoration or replacement of Plaintiffs' personal property, which was covered in toxic ash, soot, and char.

51. The same day Defendant issued its estimate reflecting a Net Actual Cash Value payment of $43,712.73, it issued a $38,089.73 payment to Plaintiffs for "Smoke Damage – Building." The payment was associated with no further remarks. Defendant never explained

to Plaintiffs the basis for its settlement payment. Defendant failed to supply to Plaintiffs a copy of the estimate upon which the settlement payment was based.

**Coverage A – Dwelling**

52. Because of the extensive visible damage to Plaintiffs' windows and doors, Plaintiffs contacted a window specialist, Logan Blake, who agreed to inspect their windows.

53. On or around January 17, 2022, Mr. Blake performed an inspection at Plaintiffs' Home and concluded that all of the windows were damaged by the Marshall Fire.

54. On or around January 27, 2022, Plaintiffs procured a second opinion regarding the window damage from Tony Pricola. Mr. Pricola observed that the windows were damaged from heat, flying debris, melted frames, and discoloration. Mr. Pricola concluded that ash penetrated the home because of warpage in the check rail between the window sashes. Accordingly, Plaintiffs procured a window estimate from Pella, which totaled $115,416.89. Plaintiffs submitted this information to Defendant.

55. That same day, on or around January 27, 2022, Defendant sent a new adjuster, Jordan McCallis to inspect Plaintiffs' windows. After he performed his inspection, Mr. McCallis told Plaintiffs he was going to write in his report that they needed all new windows because of warping caused by the Marshall Fire.

56. However, on or around February 10, 2022, Defendant issued a supplemental payment of just $3,648.79 to Plaintiffs for "Smoke Damage – Building," with the remark, "Sup- Pnt W, replace Base on main floor excl Laundry Room – Stuc Rep on BBQ Surround Wall ppr boys room." Defendant never explained to Plaintiffs the basis for its supplemental settlement payment. Defendant failed to supply to Plaintiffs a copy of the estimate upon

which the supplemental settlement payment was based. Apparently, Defendant did not approve the window damage.

57. On around February 22, 2022, Plaintiffs procured a written report from Mr. Blake, which Plaintiffs provided to Defendant. Mr. Blake's report provided, in part:

> All window units have significant frame warpage, prohibiting proper sealing along the weatherstripping.
>
> All vinyl windows utilize a hollow frame system equipped with weep holes for moisture management. All of the windows at this address have frames that are completely clogged with ash, and the photograph below demonstrates the level of ash infiltration that occurred during and after the fire, even though the windows were closed and locked at the time. This infiltration was facilitated by the heat warpage that all windows were subjected to, and will not permit these windows to drain properly, which will result in water and structural damage. Like warpage, this level of clogging cannot be repaired, and must be replaced.
>
> I was a window installer in CO for 17 years, and have extensive experience with all available products that are currently, and have been historically installed along the Front Range. All of the windows at this address have been permanently damaged by both heat, wind and ash infiltration, and must be replaced to make the homeowner whole, and to ensure that no further structural damage occurs in this home.

58. On or around March 2, 2022, Defendant sent a third adjuster, Marcus Bush, to inspect Plaintiffs' Home. And again, on or around March 16, 2022, Mr. Bush conducted a subsequent inspection. During that inspection, Mr. Bush told Plaintiffs that he agreed their windows needed to be replaced, and that they would soon be approved.

59. However, on or around March 23, 2022, Mr. Bush told Plaintiffs that a State Farm engineer would need to inspect the windows and flooring.

60. On or around March 30, 2022, Defendant's engineer, Kevin Vanderbrook of VECO Consulting, conducted an inspection at Plaintiffs' Home. During the inspection, Mr. Vanderbrook requested a copy of Mr. Blake's report. During his inspection, Mr. Vanderbrook

never left the main floor of Plaintiffs' Home. Mr. Vanderbrook did not inspect the heated floor in Plaintiffs' upstairs bathroom, or the water-damaged floor in Plaintiffs' basement.

61. On or around April 3, 2022, Mr. Vanderbrook submitted a report to Defendant rebutting Mr. Blake's opinions. Mr. Vanderbrook's report was plagued with inconsistencies.

62. With respect to thermal damage, Mr. Vanderbook acknowledged: "Windows on the front elevation do show some distortion of the Low-E film. It is possible that heat from the nearby fire elevated the temperature in these windows, causing damage to the Low-E Film." Nevertheless, Mr. Vandrbook concluded: "Although fire damage in the immediate vicinity of this home was severe with numerous homes burned to the ground, we did not observe any indication that heat damaged the exterior of this home in any way."

63. And with respect to ash and soot penetration, Mr. Vanderbook acknowledged: "There is some soot accumulation in the interior window tracks on the rear elevation . . . ." Nevertheless, Mr. Vanderbrook concluded: "There is . . . no evidence that the weep holes were *completely* clogged with soot or ash . . . ." (Emphasis added.)

64. With respect to the heated flooring in Plaintiffs' bathroom, Mr. Vanderbook did not reference any observations (because he did not perform an inspection), but speculated: "It would be virtually impossible for heat or fire to cause damage to the radiant in-flooring heating system." Plaintiffs ultimately learned from their third-party contractor that the heating coils had become clogged with ash and soot.

65. Finally, Mr. Vanderbook made no findings concerning Plaintiffs' basement floor, which became damaged during the Marshall Fire by leaking pipes after authorities cut power in the middle of winter to prevent the spread of the Fire.

66. On or around April 5, 2022, Defendant issued Plaintiffs a coverage letter stating that it would estimate for replacement the windows on the front elevation only, along with a single garden window in the rear. Defendant denied coverage for the remaining windows, Plaintiffs' upstairs bathroom floor, and the basement floor, on grounds that said damage was caused by "wear, tear, and deterioration."

67. Setting aside the apparent unreliability of Mr. Vanderbrook's report, Defendant had zero factual basis, whatsoever, for concluding that the basement floor was damaged by "wear, tear, and deterioration."

68. When Plaintiffs identified this discrepancy to Defendant, Mr. Bush told Plaintiffs that if the basement floor became damaged from leaking pipes, Plaintiffs would need to open a separate insurance claim.

69. However, on January 3, 2022, the Colorado Division of Insurance had issued Bulletin No. B-5.43, concerning Marshall Fire claims handling, which provided in part:

> In the event a fire damaged home suffers additional damage from frozen pipes, water, or other weather-related damage, the Division directs insurers to consider this damage related to the fire and treat such losses as one claim, subject to one deductible.

70. Moreover, despite Defendant's written representation that it would, at the very least, estimate for replacement the windows on the front elevation, along with a single garden window in the rear, Defendant did not issue any additional payments under the Coverage A – Dwelling to Plaintiffs for another four months.

71. At this juncture, Plaintiffs became concerned that if they continued to rely on Defendant to investigate the damage, their Home would never be restored to its safe and habitable, pre-loss condition.

72. Because Defendant had failed to investigate, inspect, or test for particulate infiltration and contamination, Plaintiffs contacted an independent ACAC Council-certified Fire and Smoke Damage Technician, Jeanine Humphrey, to investigate, inspect, and test for particulate infiltration and contamination.

73. On April 27, 2022, Ms. Humphrey performed toxicity testing and visual inspections for fire and smoke damage at Plaintiffs' Home. Ms. Humphrey submitted her test samples to an independent laboratory, Enthalpy Analytical.

74. On or around May 9, 2022, Enthalpy Analytical issued test results, confirming the presence of unsafe levels of heavy metals in Plaintiffs' Home, including Cobalt, Chormium, Copper, Nickel, Lead, Vanadium, and Zinc. The lab results also confirmed unsafe levels of Dioxins in Plaintiffs' Home, including tetrachlorodibenzo-p-dioxins, pentaclorodibenzo-p-dioxins, hexachlorodibenzo-p-dioxins, heptachlorodibenzo-p-dioxins, octochlorodibenzo-p-dioxins, tetrachlorodibenzofurans, hexachlorodibenzofurans, heptachlorodibenzofurans, and octochlorodibenzofurans.

75. On June 13, 2022, Ms. Humphrey submitted a written report to Plaintiffs, which advised, among other actions: (1) disposal of fibrous/soft goods, (2) inspection of electronics by a professional, (3) removal and replacement all exposed insulation in the attic and crawlspace, (4) encapsulation of all exposed wooden surfaces in the attic, garage, and subfloor material, (5) encapsulation and painting of the surfaces in the Home, (6) disposal of kitchen appliances, (7) air duct cleaning, and (8) post-remediation testing.

76. Alarmed by the particulate infiltration and contamination inside their Home, Plaintiffs submitted Ms. Humphrey's report to Defendant.

77. In accordance with the recommendations in Ms. Humphrey's report, Plaintiffs procured and submitted to Defendant estimates from independent third-party contractors for the restoration of their Home.

78. Defendant, however, refrained from issuing any additional payments to Plaintiffs. Instead, Defendant assigned two new adjusters, Rick Grabowski, and then, Taylor Main, to adjust Plaintiffs' claim.

79. Furthermore, only after Plaintiffs paid out-of-pocket for an independent ACAC Council-certified Fire and Smoke Damage Technician to test their home, and approximately six months after Plaintiffs' Home became visibly penetrated by ash, soot, and char, Defendant reluctantly agreed to send its own industrial hygienist to perform an inspection.

80. To date, however, Defendant has not disclosed the findings of its industrial hygienist to Plaintiffs.

81. Nevertheless, over seven months after the date of loss, on or around August 4, 2022, Defendant issued an $87,402.62 supplemental payment to Plaintiffs for "Smoke Damage – Building," with the remark, "ACV for insulation, cleaning, and windows." Defendant never explained to Plaintiffs the basis for its supplemental settlement payment. Defendant failed to supply to Plaintiffs a copy of the estimate upon which the settlement payment was based.

82. The Policy's Coverage A limit of liability is $622,000.00. Plaintiffs' Home sustained not less than $318,383.25 in damage to the Dwelling due and owing under the Policy, as evidenced by estimates prepared by independent third-party contractors. Plaintiffs'

deductible is $3,110.00. Defendant, however, has issued to Plaintiffs just $129,141.14 in payments under the Policy's Coverage A.

**Coverage B – Personal Property**

83. On January 3, 2022, the Colorado Division of Insurance issued Bulletin No. B-5.43, concerning Marshall Fire claims handling, which provided in part:

> [P]articulate infiltration and contamination must be addressed.
>
> When handling the smoke, soot, ash, or water damage claims, the Division directs insurers to consider the related long-lasting effects on electronics, furniture and other property when estimating the total damage. Merely cleaning the walls and property will not necessarily return the property to pre-loss condition. Companies must consider their policyholders' concerns about faulty wiring, inoperable electronics, and soft material contamination. Health related issues, including respiratory difficulties, directly caused by exposure to smoke, soot, ash, or mold are damage and loss, and insurers shall consider reasonable substantiation to make appropriate coverage decisions.

84. During the Marshall Fire, Plaintiffs' Home was penetrated by toxic smoke, ash, soot, and char that emitted from burning houses, automobiles, and other man-made structures. After the Marshall Fire, the personal property in Plaintiffs' Home was covered in ash, soot, and char. This included hard- and soft-surfaced furniture, hard- and soft-surfaced personal property, appliances, electronics, and clothing.

85. On or around January 4, 2022, Defendant issued a $10,000.00 check to Plaintiffs for "Smoke Damage – Personal Property" with the remark, "Coverage B Advance." Without inspecting the Property, Defendant already had sufficient information to conclude that Plaintiffs' personal property was damaged by the Marshall Fire.

86. However, after Defendant's adjuster, Mr. Nguyen, inspected Plaintiffs' Home on January 13, 2022, Defendant never provided Plaintiffs with an estimate for the damage to their personal property.

87. On or around February 10, 2022, Defendant issued a supplemental personal property payment to Plaintiffs for $12,532.84. Defendant failed to supply to Plaintiffs a copy of the estimate upon which the supplemental settlement payment was based.

88. On or around May 14, 2022, Defendant issued a supplemental personal property payment to Plaintiffs for $5,579.00. Defendant failed to supply to Plaintiffs a copy of the estimate upon which the supplemental settlement payment was based.

89. Upon information and belief, Defendant issued payment to Plaintiffs for the replacement of their mattresses and mattress systems. However, Defendant failed to issue payment to Plaintiffs for the replacement of any of their other fibrous/soft goods.

90. On June 13, 2022, Plaintiffs' independent ACAC Council-certified Fire and Smoke Damage Technician, Ms. Humphrey, submitted a written report to Plaintiffs, which advised, among other actions: (1) disposal of fibrous/soft goods, (2) inspection of electronics by a professional, and (3) disposal of kitchen appliances. Ms. Humphrey's report also confirmed the presence of particulate matter and contamination throughout Plaintiffs' Home.

91. Meanwhile, on or around June 20, 2022, Defendant's adjuster, Mr. Grabowski instructed Plaintiffs that they would need to hire a third-party contractor to estimate the cost of cleaning their personal property before Defendant could complete its evaluation of their personal property claim.

92. However, in light of Ms. Humphrey's report, Plaintiffs remained concerned that fibrous/soft goods and appliances needed to be disposed of and replaced. Nevertheless, based on Mr. Grabowski's instructions, Plaintiffs procured professional cleaning estimates totaling not less than $87,819.16, which they provided to Defendant on or before July 1, 2022.

93. When Plaintiffs submitted the professional cleaning estimates to Defendant in accordance with Mr. Grabowski's instructions, they also submitted to Mr. Grabowski Ms. Humphrey's report, which advised as to the replacement of personal property, and confirmed the presence of particulate matter and contamination throughout Plaintiffs' Home.

94. Defendant, however, did not issue any additional payments for the restoration or replacement of Plaintiffs' personal property. Instead, Defendant informed Plaintiffs that it decided to hire its own industrial hygienist to investigate Plaintiffs' personal property claim. On July 25, 2022, Defendant issued a letter to Plaintiffs stating, in part:

> Our settlement of your claim includes replacement of small appliances such as toasters, blenders, etc. We have secured a Certified Industrial Hygienist to inspect the soft goods and large appliances. Once their report is received and reviewed, we will consider any needed revisions in accordance with the report.

95. On August 4, 2022, Defendant issued a supplemental personal property payment to Plaintiffs for just $11,811.34. Defendant never disclosed the findings of its industrial hygienist to Plaintiffs. Defendant did not explain to Plaintiffs the basis for its supplemental settlement payment. Defendant failed to supply Plaintiffs a copy of the estimate upon which the supplemental settlement payment was based. Defendant merely informed Plaintiffs in a remark that its payment comprised of "Pack out and 1 month storage for PP."

96. The Policy's Coverage B limit of liability is $466,500.00. Plaintiffs' Home sustained not less than $87,819.16 in damage to personal property due and owing under the

Policy, as evidenced by estimates prepared by independent third-party contractors. In addition, food items, fibrous/soft goods, and appliances are not salvageable and need to be disposed of and replaced. Defendant, however, has issued just $39,923.18 in payments under the Policy's Coverage B.

**<u>Coverage C – Loss of Use</u>**

97. Because Plaintiffs' Home was penetrated by toxic smoke, ash, soot, and char, they have been displaced and living in temporary housing since the Marshall Fire blazed through their neighborhood on December 30, 2021.

98. Because Plaintiffs fled their home without their personal property, they were forced to incur substantial out-of-pocket expenses to maintain anything close to a semblance of their normal standard of living.

99. Defendant, however, has limited its Coverage C – Loss of Use payments to covering the cost of hotels, rental properties, and rental furniture. With respect to Plaintiffs' additional out-of-pocket expenses, Defendant has made only vague references to "Additional Living Expense" in remarks associated with payments made under the Policy's Coverage B – Personal Property. Defendant has failed to supply to Plaintiffs a copy of the estimates upon which its Additional Living Expense settlement payments have been based.

100. Moreover, Defendant has habitually delayed payments to Plaintiffs' landlords for their temporary housing. When staying at Plaintiffs' prior rental, 541 Main Street, Louisville, CO 80027, Plaintiffs' landlord, Collin Metz, indicated that he would not renew their lease because Defendant's payments were habitually late. Because of Defendant's

habitual delay, Plaintiffs were forced to move their family out of their rental, into another hotel, and subsequently, into a new rental property at 529 Main Street, Louisville, CO 80027.

101. Plaintiffs have and continue to incur out-of-pocket additional living expenses (in addition to direct rental costs, which have been paid for by Defendant). These out-of-pocket expenses constitute a bare minimum for Plaintiffs to maintain anything close to a semblance of their normal standard of living. Aside from direct rental costs, Defendant has not issued payments under Coverage C – Loss of Use, other than vague references to Additional Living Expense under payments for Coverage B – Personal Property.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**

102. Plaintiffs incorporate the allegations stated above.

103. Defendant offered to insure Plaintiffs' Home in exchange for the payment of insurance premiums.

104. Plaintiffs accepted Defendant's offer.

105. Under the Policy, Plaintiffs and Defendant entered into a contract of insurance.

106. Plaintiffs performed on the contract of insurance by paying insurance premiums to Defendant, and complying with all material duties under the Policy.

107. Defendant breached the contract of insurance by failing to pay all covered benefits due and owing to Plaintiffs under the Policy.

108. Because of Defendant's breach, Plaintiffs have incurred damages for covered insurance benefits due and owing under the Policy, in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**(Violation of C.R.S. § 10-3-1115)**

109. Plaintiffs incorporate the allegations stated above.

110. Defendant is engaged in the business of insurance.

111. Under the Policy, Defendant owes insurance benefits directly to Plaintiffs.

112. Defendant delayed and continues to delay payment of covered insurance benefits owed to Plaintiffs. Defendant denied and continues deny payment of covered insurance benefits owed to Plaintiffs.

113. In delaying and denying payment of covered insurance benefits owed to Plaintiffs, Defendant engaged in acts and/or omissions that violate industry standards, including, but not limited to:

a. Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

b. Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

c. Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

d. Refusing to pay claims without conducting a reasonable investigation based upon all available information;

e. Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;

f. Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;

g. Making claims payments to insureds or beneficiaries not accompanied by statement setting forth the coverage under which the payments are being made;

h. Failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage;

i. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement;

j. Failing to supply the beneficiary or claimant with a copy of the estimate upon which the settlement is based, when partial losses are settled on the basis of an estimate prepared by or for the insurer;

k. Failing to require that any estimate prepared by or for the insurer covering damages that are visible or evident at the time of inspection is adequate to restore the property within a reasonable time to its condition before the loss, in accordance with applicable policy provisions;

l. Failing to pay for repair services and products based on prevailing competitive price, as established by competitive bids, generally accepted insurer-based methodology, or market surveys that determine a fair and reasonable market price for similar services;

m. Failing to assume all reasonable costs sufficient to pay for the beneficiary's or claimant's repairs including materials or parts, less any applicable deductible or reduction for comparative negligence; and

n. Failing to promptly pay the cost of property repair services and products from any repair facility location that is within a reasonable distance, less any applicable deductible amount payable by the beneficiary or claimant according to the terms of the insurance policy, at no less than the prevailing competitive market price in the same geographic area;

114. Defendant's delay and denial of covered insurance benefits owed to Plaintiffs was and continues to be without a reasonable basis.

115. Because of Defendant's unreasonable delay and denial of covered insurance benefits, Plaintiffs have been forced to take out a second mortgage to pay for the restoration of their Home to its safe and habitable, pre-loss condition.

116. Under C.R.S. § 10-3-1116, Plaintiffs are entitled to recover from Defendant two times the covered benefit that Defendant unreasonably delayed and/or denied, in an amount to be determined at trial, in addition to their damages for Breach of Contract. Plaintiffs are entitled to recover their costs and reasonable attorney fees.

## PRAYER FOR RELIEF

Plaintiffs Jennifer Dawn Hart and Geoffrey Sebastian Hart respectfully request this Court enter judgment in their favor and against Defendant State Farm Fire and Casualty Company, and award Plaintiffs their actual damages and statutory damages, in an amount to be determined at trial, and pre- and -post judgment interest, costs, and reasonable attorney fees.

**PLAINTIFFS DEMAND A TRIAL BY JURY**

Respectfully submitted September 30, 2022.

HENNESSY PLLC

*/s/ Stephen H. Hennessy*
Stephen H. Hennessy, Esq.
4450 Arapahoe Ave. Ste. 100
Boulder, CO 80303
(303) 630-9169
shennessy@hennessypllc.com

*Counsel for Plaintiffs Jennifer Dawn Hart and Geoffrey Sebastian Hart*